Thank you and good morning. Once again, Mark Pardo for Appellant Zhejiang Dunan. Your Honor, we have two issues that we'd like to discuss this morning, and the first one I'd like to discuss is the evaluation of Grass Bar by the Department of Commerce. We feel that there are several facts on the record that illustrate our concern about the valuation of Grass Bar used by Commerce. First, the record is very clear that the input which the Department of Commerce was attempting to value was simply Grass Bar. Second, the actual product descriptions contained from India Info Drive for 100% of the shipments from the countries of France, Japan, and the UAE are clearly designated as not being Grass Bar. Instead, these shipments are comprised of products such as cupronickel bar, beryllium copper flat bar, and bronze bar aircraft raw material. Are those substitutable products? No, Your Honor. Same market? No, Your Honor. How do we know it's not the same market? Well, Your Honor, the record clearly shows that these products are not at all fungible with Grass Bar. They have a different composition and they have vastly different uses. More to the point, Your Honor, the record is very, very explicit that even were these fungible products that could, in some desperate situation, be used to make the subject valves, Dunan did not use them. Dunan was clearly using Grass Bar. Therefore, what the Department of Commerce must be doing is attempting to value Grass Bar. Don't they have the same H2S, HTS code? Well, that's correct, Your Honor, and that's, in essence, the root of the concern here is that they were, yes, they were valued under this. And they all contain copper. They all contain copper. But they're not the same market. They're not. They are simply not the same product, Your Honor, absolutely. And in addition to that, the record clearly shows that all of these shipments have much higher prices than the shipments of Grass Bar from other countries. Wasn't the problem that Commerce really felt that you didn't prove that these were fundamentally different products? I mean, the HTS category itself isn't problematic. You're trying to say that somehow some things got miscategorized. Your Honor, even at this point, I have some difficulty in parsing through what exactly was the Department's actual concern because, with all respect, I think that it's abundantly clear on the record, Grass Bar is one product. Beryllium copper, cupro-nickel are not Grass Bar. These are not synonymous terms for Grass Bar. They are clearly a different product. Although they may be alloys which contain copper, that in and of itself certainly does not make it synonymous with Grass Bar and clearly does not make it fungible for Grass Bar in the purposes of constructing these valves. Therefore, if the record clearly shows these shipments are beryllium copper, cupro-nickel, or bronze bar for military aircraft use, it seems self-evident that the inclusion of these shipments within a valuation for Grass Bar is going to be distortive. Now, any claims that the Department of Commerce has raised with respect to an unreliability of the actual product descriptions contained within India Info Drive, we submit are just simply without merit. Both the Department of Commerce and the Court of International Trade have recognized that Info Drive obtains its information from the official Indian customs records, exactly the same source which is used by the World Trade Atlas when they are compiling the Indian import statistics. In light of this fact, the Court of International Trade has noted that it is wholly unreasonable for the Department of Commerce ever to consider the actual product descriptions from India Info Drive as being somehow unreliable or inaccurate while at the same time saying that the World Trade Atlas import stats are on their face reliable and accurate because they are coming from the identical source. The only difference being that India Info Drive provides the information in a disaggregated form in which it provides a far greater level of detail. One of these levels of detail which they provide, which is not provided by World Trade Atlas, is the actual product description of each individual shipment. So yes, even though the HTS classification is also provided by India Info Drive, it is very important to note that Info Drive does not provide that HTS classification as an alternative description of the product. In fact, the Court of International Trade specifically noted in its opinion below in a footnote that Info Drive has stated one of the primary reasons it provides the actual product description from the shipping bills is because the HTS classification in India is often wrong. Products are often misclassified. Therefore they provide the actual product description in order to give a far greater level of detail. But Counselor, so here's how I understand it, you're really saying that we need to credit Info Drive as being more accurate than WTA classification data. Well, with respect, Your Honor, it's a two-part argument. To begin with, WTA and Info Drive are obtaining their information from the exact same source, which is the actual Indian Customs records. But WTA nonetheless classified these items under the brass bar classification. So you're saying that we should construe the Info Drive data, we should construe that as accurate and the WTA classification as incorrect. We should assume that from this little parenthetical that says copper bar that the WTA therefore classified this entry wrong. If I may, Your Honor, it's important to understand WTA and Info Drive, for that matter, are not classifying these shipments. All they are doing is simply taking the official Indian Customs records and reporting them as they were submitted by the importer or the broker or whomever it was that reported it. They are not looking at this and determining, based on what this product is, whoever the importer was in India or their customs broker. So the importer classifies them and he also provides information, so he says, here is my HTS classification and I'm importing copper bar. Correct. The shipping bills, the official shipping bills show this is a shipment of beryllium copper and the official customs records also show that for whatever reason, those shipments of beryllium copper were classified under the HTS for brass bar. I'm going to put up this stupid question. I'm sorry, I'm kind of ignorant of how this all works, but if I said I'm importing Barbie dials and put it under the HTS classification code for brass bar, no red flags are going up anywhere? Your Honor, Your Honor, unfortunately I cannot speak to what the reviewing or vetting mechanism is in India. But that is precisely as InfoDrive India says why, when they provide the far greater level of detail, why they provide the actual product description from the shipping bills, because in their own words, the HTS classifications for imports within India are often unreliable. Therefore these are not, the two pieces of information we have, the classification and the actual product description of the shipment cannot be considered both reasonably reliable indices of what this product is. Maybe the description is the unreliable part. Again Your Honor, to assume that hypothetical, then one might also assume that it wasn't classified under that HTS and perhaps when WTA or InfoDrive transcribed that information, they got that wrong. But the problem is with the cases that you rely upon, primarily what those cases are focusing on is the extent to which the InfoDrive data indicates that the HTS category for the product being examined was actually wrong. And in your case, you're not disputing that the HTS category for your product was wrong. You're just saying that when establishing a surrogate value, it was somehow over-inclusive. But you didn't present any evidence that that surrogate value was wrong, you just simply pointed to this InfoDrive and said there's some stuff in there that shouldn't have been in there. Well Your Honor, if I may, it's the overarching goal when Commerce is using this methodology is accuracy. And if it is undisputed that what Commerce is attempting to do is generate a surrogate value for brass bar, then if there is record evidence which shows that 100% of the shipments from these three countries is a product other than brass bar, then I simply don't see how a reasonable person comes to the conclusion that the resulting surrogate value for brass bar is more accurate by including those products as opposed to excluding them. But whose burden is it to establish that the InfoDrive data is more accurate than the HTS categorization? Well, again, with respect, Your Honor, there's no chemical analysis done. Well, Your Honor, if I may, again, the Department of Commerce and the Court of International Trade have already recognized it is not an issue of establishing that the InfoDrive data is more accurate. It's coming from the exact same source. So if Commerce is going to assume that the World Trade Atlas data is accurate merely because it's there and was reported by the World Trade Atlas, it must also assume the same for the InfoDrive data because it is coming from the same source. This was specifically recognized by the Court of International Trade. Now, with respect to the chemical analysis, Your Honor, I would again note that within this case would be utterly meaningless because the record shows that cupronickel, beryllium copper are simply separate products. A chemical analysis could no more show that beryllium copper is brass bar than a chemical analysis of an apple could demonstrate that an apple is really an orange. It's simply not necessary. Even if we accept all this, isn't this the three-prong analysis we're supposed to engage in and didn't Commerce specifically find that the other prongs wouldn't be satisfied here? I don't believe so, Your Honor. I'm sorry. Well, that the WTA data, the data you're talking about, the InfoDrive data, constitutes at most 25 percent of the data that it was referring to. Well, Your Honor, that may be in the aggregate, but with respect to the three countries which we are disputing right now, I believe that the record shows that 100 percent of the shipments are covered by InfoDrive and 100 percent of the shipments are shown to be products other than brass bar. If I may, I see I'm running out of time. May I continue the second issue? You may. The second issue we'd like to discuss was the application of partial adverse facts available to certain sales that Dunant made in December of 2007. Our primary concern here is there is a very, very serious disconnect between the information which Commerce found to be missing or unusable and the adverse inference which they applied. The record clearly shows... And is your argument basically that you think they should have chosen, there are two alternatives for the number of sales or volume of sales and the adverse facts should have been, they could have picked the worst one of those two, but that's where it should have stopped? Well, no, Your Honor. They would have further discretion than that. However, under the statute, it's very clear that if the one and only piece of information which has been found unusable is the quantity, then if that is the missing information, the statute clearly says whatever adverse inference should be applied should be applied with respect to the missing information. If you apply an adverse inference with regard to quantity, if you're not choosing between one of those two alternatives, what could they have picked? They could select whatever they like. The important point here, which we cannot emphasize enough, is that quantity is not used in calculating transaction-specific margins. Therefore, Commerce had fully accepted and fully verified information for all of these sales in order to calculate the transaction-specific margin. Thus, by using as an adverse inference for quantity the China-wide margin, what they have done, in essence, is they have taken this entire body of fully accepted and verified information and rejected it. And that is simply contrary to the statute. Adverse inferences must be limited to the information that is missing. And if that were not clear from the statutory provisions with respect to the use of facts otherwise available for adverse inferences, it is also very clear from 1677 M.E. Under 1677 M.E., the Department of Commerce is prohibited from refusing to accept less than perfect data that is on the record. Now, if the statute requires Commerce to accept less than perfect data, then again, it's self-evident that Commerce cannot have the authority to reject fully accepted, fully verified information that is available on the record to calculate a transaction-specific margin. Any sort of an adverse inference, which the Department is using in this case, must be specifically limited to the missing or unusable quantity information, which they found was the only issue with respect to these sales. To do otherwise is directly arbitrary and punitive and contrary to the statute. Unless there are any other questions, may I reserve what time I have remaining for rebuttal? Thank you, Mr. Pardo. Thank you, sir. Ms. Preheim? Good morning, Your Honor. Mr. Preheim. Mr. Preheim. Good morning. I apologize. That's all right, Your Honor. With respect to the first issue, Your Honor, the use of a surrogate value for Graspar Commerce's decision here was reasonable. The entry titles from InfraDrive alone were simply not sufficient. On the one hand, we have the WTA data, which is data that is published by the Indian government, publicly available data. It's data that Commerce is certainly familiar with and uses in many instances. On the other hand, we had InfraDrive, which also lists these entries under the same HTS category as the WTA data. That is, it lists these— Well, because it came under—it was classified under those categories. That's right. Exactly. InfraDrive—no one's alleging InfraDrive makes its own determination of classification. No, and it also doesn't make its own determination as to the accuracy of the entry titles. It's simply reporting the information that it gets. So on the one hand, InfraDrive lists the HTS category as Graspar, and then on the other hand, it also lists the entry titles. If Commerce—if there was no question that things were misclassified, like consistently in France, they would put Copper Bar under the Graspar heading when it shouldn't have been. Then what would have happened? That would be a different situation. There are cases where Commerce obtains documentation that shows that a country could not have exported to India Graspar. They don't make it. They don't import any. That's a different situation. We don't have evidence like that on the record here. All we have is inconclusive information from InfraDrive. Do you understand Copper Bar to be different from Graspar? Are they fungible products? No. I think they would be different products. Then certainly your economists understand the same thing. Why not just factor out something that is not the same market? It's not the same market. It's that simple. Because the data is inconclusive on this issue. Keep in mind what InfraDrive reports. On the one hand, InfraDrive is saying this is Graspar because it's listing the HTS category as Graspar. The data could be instantly verified by going to any expert and ask them, can you use Copper Bar interchangeably with Graspar? No. Different market. Okay. Then we'll treat it differently. This is not rocket science. But respectfully, Your Honor, we don't know that that's what this is. We don't know it's Copper Bar. It's your job to find out. You can easily make an inquiry to find out if Copper Bar is the same as Graspar. Why wouldn't you just do that? It's not just a question of is Copper Bar the same as Graspar. It's a question of determining. It's a market question. Are they the same market? And that is easily ascertainable. Respectfully, Your Honor, I think the problem with Your Honor's question is it's assuming the accuracy of the InfraDrive titles as opposed to the HTS category. We can't tell from the record here which is the more accurate. And keep in mind. But why can't you ascertain that? Why isn't it your job? Your job is to get the correct margin. With respect to inputs, Your Honor, Commerce uses the best available information. So that's the question here. In other words, is it the best available information? Was it reasonable for Commerce to say, no, we're going to use the WTA data as a whole? And keep in mind. And with one additional simple step, you could have made that the best available information Instead, you took information which resulted in a really egregious dumping margin here. Well, no, I don't think this information had that big of an effect in the dumping margin, Your Honor. But I will say again, on the one hand, the InfraDrive data itself is inconclusive as to this. If I can use an example, Your Honor, Donan in the reply brief gave the canned peas example. Donan said, well, if we go to the grocery store and we see a shelf that's labeled canned peas and we pull a can off the shelf and the can is actually labeled cream corn, well, obviously it's not canned peas then. There's a mistake. That's not our case. In our case, we have a shelf that's labeled canned peas. We have a can. We pull a can down from the shelf. The can on the one side, the label being equivalent to the InfraDrive information, the can on the one side says that it's canned peas. You know, it lists the HS category. And on the other side, it just says… That's not accurate. Because in this case, the HTS code is taken from the WTA informational report. Your analysis would be right if InfraDrive was the one printing the label on both sides and making its own determination of what's in the can. Well, that's true with respect to all the information that InfraDrive presents, not just the entry titles but also the HTS category. So InfraDrive itself shows, on the one hand, an HTS category that lists brass bar, and on the other hand, it shows entry titles which don't say brass bar. This goes back to the burden question that I asked your opposing counsel. So whose burden is it if there is an apparent discrepancy, and you say that all we can assume is that it's an apparent discrepancy because if it's still in the same HTS category, that it could be that it really is brass bar. So whose burden is it to establish that it should be outside of your calculation? It is Danan's burden to go to commerce and to say no, and explain why, and put information on the record that shows why, why these are miscategorized, for example. Now keep in mind, Danan is also, its argument is also inconsistent. There are many other entries in the WTA data that don't list brass bar that Danan isn't contesting. Moreover, there's also information that the WTA presents, for example, it's information from Sri Lanka, so the WTA says there are imports of brass bar from Sri Lanka. Infodrive doesn't list anything for Sri Lanka, but those values are very low, so Danan likes those values, so what it's done is it's cherry-picked certain information, and it wants commerce to exclude it, but without providing information on the record to show why. So with respect to, I want to move on to the second issue, unless the court has further questions on the first issue. With respect to the application of adverse facts available to sales of two models in December of 2007, it's important to understand December of 2008 was when the verification took place. Commerce accepted all of Danan's data prior to that time. There was no suggestion by Danan that anything was amiss with the data, and it wasn't until verification that commerce uncovered significant discrepancies in the data. The invoice that Danan presented to commerce and presented as accurate, in fact, didn't match other information in the record, the consumption report. Danan gave one explanation, then changed his mind and gave another explanation. Even if all that's true, even if the quantities were wrong, you don't need quantity to establish the transaction-specific dumping margin where you've got unit price. And I think what Danan doesn't understand is that what commerce said is we cannot verify these sales of these models. And again, this was a limited application. Commerce focused on two models in December. Even with respect to other months for the same models, commerce accepted that information. Even with respect to other models in December, commerce accepted the information. But what commerce said is for these two models in December, we simply cannot verify the information you provided us. You've changed your story from one day to the next. But they didn't say they couldn't verify the unit price information. It was only the volume of sales. Well, what commerce said, no, commerce said it was the sales information as a whole. That's at page, both in the adverse facts available memorandum. Are you penalizing them here for having poor records? No, Your Honor. That's not in the statute. No, Your Honor. Obviously, this is not a matter of penalizing anyone. The point of the adverse facts available margin is to encourage future cooperation. It's not meant as a punishment. But my point is, turning back to your- This was established on a long-term basis. It wasn't established on a monthly basis, correct? There is other information in the record that does show price. But what commerce said is because you have not been able to explain the information for these two models in December, we simply cannot accept the sales information. That includes all the information for those two models. Even though there was no evidence that the unit price had ever changed. This is a requirements contract. The unit price was set up front, right? Yes, that's true. But again, if I could just focus on the invoice that was presented, you had a significant amount of information on the invoice that couldn't be verified for those two models. And as I said- Tell me what the information was. It was the quantity information, the total value information, and then if you add up all the total values for all the models, you get a grand total. And that number didn't match either. Because you didn't have the quantities. Yes. Yes. But I mean, basic math, when you're doing the total value, it wasn't the transaction price that made it difficult to determine total value. Yes. But what commerce said, and this is reasonable, what it said is you have not been able to explain this information to us and how this information matches up. So we simply cannot accept any of the information you provided just for those two models. Again, it was a limited decision. It was focused on those two models in one month. And that decision was reasonable. Finally, with respect to the choice of the adverse facts available rate, Danan waived that issue. It didn't challenge that in the Court of International Trade. The Court of International Trade specifically said that Danan doesn't argue that commerce failed to corroborate the petition rate. Now Danan now cites its reply brief before the trial court. Of course, arguments raised in reply briefs are waived. You can't raise an argument first in a reply brief. And moreover, Danan wasn't making this argument, even in its reply brief. Danan was making a different argument regarding the use of the China Y rate. Now Danan also cites an exception to waiver. They say this court can apply the correct law, even if it's not argued below. This is not a question of the law that we're applying here. It's a factual question. Corroboration is factual. Danan, in fact, says in its opening brief that its argument is that substantial record evidence does not support commerce's use of the rate. So this is a factual question. And moreover, Danan's purported exception to waiver, simply because this involves a statutory issue, that would swallow the rule. But we don't want to get to that issue if we assume you're correct with respect to the application of the adverse influence? Yes, that's right. Unless the court has any further questions, we respectfully request that the court affirm the trial court in all respects, except with respect to the calculation of the labor wage rate. Thank you, Mr. Preheim. Thank you. You've left a minute for Mr. Denan. Sorry, I set him up for 12. You set him up for 12, so Mr. Denan gets his full. Actually give him four, because Mr. Preheim ended a minute early. So Mr. Denan, you get an extra minute, not only a minute. Thank you very much, Your Honor. And if it pleases the court, I won't go over what the Justice Department has done, but I would like to focus on a couple salient points. First, on the valuation of the brass bar. The thing to keep in mind is that it is a false assumption that the infodrive information on the type of the bar is correct. We don't know if it's correct. What we do know is that the information on the infodrive, that one of the two items is incorrect, either the HTS number is incorrect or the description is incorrect. Each of those other products, beryllium, cuponickel, copper bar, have their own HTS number. So one of the two is wrong. But is it fair for Commerce to just pick which one they want then? Commerce didn't do that. Infodrive also doesn't have 100% of the entries. The WTA does have 100% of the entries. And what Commerce said is without any kind of chemical analysis to know whether those descriptions are right or wrong, we're not going to guess which one is right or wrong in infodrive. We will just go to the WTA, take the HTS entry for all the products that came in, and there was the high and the low. We've heard about Sri Lanka being low. And that is the best available evidence that we have. And you've got to remember, it's to the interest of the Indian Custom Service that the HTS number be correct. They really don't care about the description. Why? Because it's in the interest to collect the tariff. And I think the Court can take judicial notice that customs, all customs, want to get the HTS number right. But what Commerce said, we're not going to allow taking an incomplete database, cherry picking out, and making us guess which one is wrong when one of them has to be. We're just going to go to the WTA, all of the brass bar imports, and apply that for the surrogate value. Shifting on the ATA argument, we would submit with respect that the statement that the U.S. sales price on the gross unit price, that Commerce doesn't use the quantity to determine that, is quite frankly a red herring. That's not the issue here. What is the issue here is for those December 07 sales, Commerce could not determine what the quantity was. And in fact, Dunand refused to tell them what the quantity was. Even on the record, as admitted in Dunand in its own brief at 22, telling two inconsistent stories. Why were they hiding the quantity? The quantity, again, doesn't usually drive Commerce's determination about the rate, right? Yes, but here's the thing. Again, it's on the record that one of the explanations of the discrepancy is because if Gooden withdrew more than a certain amount, there was a rebate. Gross price has, by definition, it's the quantity sold and the unit price sold. If you go to the invoices, that's JR 540 to 545, like all invoices, it has the quantity, it has the value, and it has the total sales price. If you change any one of those, the other two have to change. So Commerce could not verify those invoices. If the quantity was wrong, the total sales price was wrong. If the total sales price was right, then the transaction price was wrong. And we know that that transaction price changed. It wasn't set at the annual contract, right? It could change, again, on the record. Thank you. And thus, we would submit to Commerce as well in its discretion. Thank you, Mr. Dionne. Thank you. Mr. Pardo, you have a little over a minute remaining. Thank you, Your Honor. If I may start with the arguments regarding adverse inferences. With all due respect to Mr. Dinan, I, again, must submit it is essential to remember that the quantity is not ever used on the calculation of a transaction-specific margin. We've made that clear, and to my knowledge, neither of our opposing counsel debates that fact. Therefore, it is also very, very clear that what Commerce has done in this case is it has a specific piece of information which it has found unusable in this case, that being the quantity. Nonetheless, it has rejected all of the other fully accepted and verified information in applying an adverse inference. And to then add insult to injury, it used the quantity which it initially said was unusable and unverifiable in the first place. This is just simply contrary to the statute. You cannot make an adverse inference by rejecting information that has been fully accepted and verified. And it is clearly punitive to do so and arbitrary. Therefore, we submit this is inappropriate. With respect to the arguments regarding cherry-picking of information in the infodrive, again, we must say with all respect this is simply invalid. We provided on the record 100 percent of the information that was available from infodrive, and we are not cherry-picking information from infodrive. It is all on the record. Should Commerce choose to look at that infodrive data in its entirety and disregard all shipments in there which are not clearly stated as brass bar, we would certainly accept that. We have focused on these three countries because infodrive shows 100 percent coverage, which is in compliance with the three-part test that Commerce has espoused in prior cases. This is why we are focusing on those three, not in an effort to cherry-pick. Thank you, Mr. Pardo. Thank you. Our last case this morning is Zoster's.